Allen, P.
delivered the opinion of the court:
By the terms of the federal constitution, the United States are bound to protect each state against invasion, and no state is authorized to keep troops in time of peace without the consent of congress. The duty of providing for the common defence being thus imposed upon the United States, and the erection and maintenance of fortifications being necessary and proper to perform this duty, the constitution confers upon con-< gress the power to exercise jurisdiction over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, &c. &c. . Having thus in a great measure surrendered the power of providing for her own protection against invasion, and her coast being exposed to aggression, the state of Virginia was called upon to cede to the United States places proper for the erection of forts, so that the United States *144 might do that for the people of the state which she could not do herself.
On the 1st of March 1821, Sess. Acts, p. 102, an ac.j. wag passe¿j entitled “ an act ceding to the United States the lands on Old Point Comfort, and the shoal called the Rip Raps.” The preamble of the act recites, “ that whereas it is shown to the present general assembly, that the government of the United States is solicitous that certain lands at Old Point Comfort, and at the shoal called the Rip Raps, should be, with the right of property and entire jurisdiction thereon, vested in the said United States for the purpose of fortification, and other objects of national defence.” And it is then enacted, “ That it shall be lawful and proper for the governor, by conveyance, to transfer, assign and make over unto the United States the right of property and title as well as all the jurisdiction which this commonwealth possesses over the lands and shoal at Old Point Comfort and the Rip Raps : provided the cession at Old Point Comfort shall not exceed two hundred and fifty acres, and the cession of the shoal at the Rip Raps shall not exceed fifteen acres: and provided also, that the cession shall not be construed or taken so as to prevent the officers of this state from executing any process, or discharging any other legal functions within the jurisdiction or territory herein directed to be ceded, nor to prevent, abolish or restrain the right and privilege of fishery hitherto enjoyed and used by the citizens of this commonwealth within the limits aforesaid: and provided further, that nothing in the deed of conveyance required by the first section of this act shall authorize the discontinuance of the present road to the fort, or in any manner prevent the pilots from erecting such marks and beacons as may be deemed necessary:” With a further provision, “ that should the United States at any time abandon the said *145 lands and shoal, or appropriate them to any other purposes than those indicated in the preamble to the said act, that then and in that case the same shall revert and revest in the commonwealth.”
The evidence in the record shows that surveys part of the lands at Old Point Comfort had been made under the direction of the officers of the United States in 1816 or 1817, and in 1818. And the law, by the proviso preventing the discontinuance of the present road to the fort, seems to recognize the then existence of a fort, which must have been in possession of the United States. After the passage of the act the United States proceeded to erect an extensive fortification on the point, but no conveyance was made by the governor, nor so far as the record discloses, any measures taken to designate the precise boundaries of the land embraced by the cession, until the year 1838.
On the 16th of May 1838, a communication from the acting secretary of war was addressed to the governor, requesting him to make a conveyance in the manner prescribed by the provisions of said act* and for the maximum quantity of land contemplated to be ceded; and referring the governor to Captain W. A. Eliason, the bearer of the communication, as being authorized by the department of war to mark out to the surveyors or other persons acting for the commonwealth of Virginia, the boundaries which for purposes of defense should be given to said cession..
This officer, on the 22nd of May 1838, addressed a letter to the governor, in which he remarked, that the limits of the ceded territory at Old Point Comfort should include all the neck of land on which Eort Monroe is situated, from the bridge to the main land * and extend as far in the northerly direction as the plat of two hundred and fifty acres will allow; that he could not say how far this would be, until he knew *146 how the law requires the survey lines to be run. That he believed the lines ought to include only the land at ordinary high water, and that the cotermjnug ¡an¿ from high to low water line pertained as a matter of course to the plotted land. He furthermore stated that the high tide limits could be readily defined ; that it would not do to leave the land between high and low water in debate; it must attach to the land above tide; and it is to be desired that it does so without increasing the number of acres in the plot.
These papers were referred to the attorney general of the state, by the governor, for his opinion and advice. That officer, after stating that it did not appear from the papers before him, whether the commonwealth owned two hundred and fifty acres of land above high water, advised that all the commonwealth’s lands should be layed off by metes and bounds; that then the surveyor should lay off, under the direction of the United States or its officers, so much of the public land, not exceeding two hundred and fifty acres, at Old Point, as they may require. That this land should be laid off by metes and bounds, the courses as well and durably marked as they could be. That the officers of the United States should elect whether they would have the whole survey laid off above high water mark; or whether they would include -in its boundaries the lands below high water mark. On the return of the survey a conveyance should be made by metes and bounds. That the grant to the United States must-be limited by the metes and bounds laid off, and they could not take either property or jurisdiction over the adjacent lands below high water mark as pertinent to the plotted land.
On the 1st of June 1838, the governor, as appears from an extract from the executive journal, directed the surveyor of Elizabeth City county, under the direction of Captain Eliason, and in accordance with the *147 opinion of the attorney general, to make surveys of the lands and shoals mentioned in the act of cession, and return a fair plat and certificate of surveys to executive. A survey was accordingly made by the surveyor, and a report returned to the governor. In the report so returned, the surveyor informs the governor that in pursuance of his directions, he applied to Captain Eliason to elect whether he would have the land ceded to the United States surveyed to high or low water mark; that he elected the former for the boundary, but requested the surveyor to spread the low water line, the mud plats and grass marsh on Mill creek, on the plat, which he had done. He further states that he began the survey at Old Point Comfort, at the southeast foot of the Mill creek bridge; and then pursued the ordinary high water mark on the Mill creek shore, until he came to the mouth of a small gut running up into the grass marsh. Prom thence he pursued a line between the high land and the marsh until he came to a piece of land taken up by Shelton. He then pursued this line, by a line of marked pines to the Chesapeake bay shore, at the ordinary high water; and then pursued the high water mark along the bay shore to the beginning; including an area of two hundred and seventy-eight acres 'one rood and ten poles, including also two acres ceded to the United States for a light-house. He then laid off two hundred and fifty-two acres for the United States, including the two acres for the light-house : and the report then gives the metes and bounds of the two hundred and fifty-two acres. The plat returned with the report shows that the land at the place described was a peninsula bounded on one side by the Chesapeake bay, on another by Hampton roads and Mill creek, having a water boundary all around the tract laid off for the United States, except upon four *148 of the lines called for. Of these, three run parallel a^d on the edge of the high land and grass which is principally covered at high water, peavi13g but one line of sixty poles in length, which divides the part so laid oil'from the adjacent land.
The report gives the boundaries, describing the survey as commencing at the southeast foot of Mill creek bridge, the position of which is designated on the plat; thence with the meanders of the creek to the mouth of a small gut running into the marsh overflowed by high tide in the creek. From this point three lines are called for; the first terminating at a dead pine on the line between the high land and the marsh; the second calls for a pine; the third calls merely for course and distance; and the plat returned shows that these three lines run between the high land and the marsh, on the edge of the marsh. From the termination of the last line on the edge of the marsh, the survey calls for a line of sixty poles to the bay shore at high water mark; and thence by various courses and distances to the beginning.
In the report, the surveyor says he pursued the high water mark along the bay shore to the beginning ; and the fact that he did so appears from the plat returned. The meanderings of Mill creek are by fourteen courses, with distances on each course, amounting to five hundred and forty-nine poles; the three lines along the edge of the marsh call for one hundred and six poles; the line across the neck of land from the marsh to the bay shore at high water mark, is sixty poles in length; the meanderings of the bay and roads are by sixteen courses, with distances on each, amounting to 864.20 poles, making the whole distance around the two hundred and fifty-two acres one thousand five hundred and seventy-nine poles, of which one thousand five hundred and nineteen poles appear from *149 the report and plat to have been a water boundary. The artificial boundaries made or marked and called for are the bridge, the dead pine and the pine.
The natural objects named are the mouth of the small gut running into the marsh, and the bay shore at high water mark, at the termination of the line across the neck between the marsh and bay.
The deed made by the governor bears no date, but an extract from the executive journal, dated the 29th of November 1838, recites that the goyernor executed a deed of cession to the United States for the lands at Old Point Comfort, and the shoal called the Eip Eaps, pursuant to an act of the general assembly of March 1821; and the same was transmitted to Captain Eliason of the United States corps of engineers, to be recorded in the court of Elizabeth City county. On the 12th of December 1838, the deed was admitted to record in the proper county. It recites the act of March 1st, 1821, with its various provisions, and conveys the land at Old Point and at the Eip Eaps, subject to the provisions of the law. It describes the tract of two hundred and fifty acres at Old Point Comfort, as adjacent to and in part surrounding a tract of two acres theretofore granted by the commonwealth to the United States, and blends both into one tract of two hundred and fifty two acres, the boundaries of which are described as beginning at the southeast foot of Mill creek bridge; and then gives the courses and distances, and other objects called for, as the same are set forth in the report of the surveyor returned to the executive. The deed in that portion of it describing the two hundred and fifty acres at Old Point Comfort, does not in so many words, refer to the report of the surveyor, or plat returned by him. But in reference to the fifteen, acres of shoal at the Eip Eaps including the site of Port Calhoun, the deed contains this clause, “ The boundaries of the said tract of fifteen acres to *150 be ascertained by reference to a plat and description made by C. Hubbard, acting surveyor of Elizabeth. City county, dated the 17th July 1838, hereto annexe(j; marked A.”
Such is the title under which the defendant, an officer of the United States, relies to protect him and the United States in the possession of the property, to recover which this suit has been instituted.
The lessor of the plaintiff claims under' a patent as for waste and unappropriated land, founded on a land office treasury warrant, and entered and surveyed under the laws of the state providing for the appropriation of the waste and unappropriated land of the state, and the grant thereof in private property to individuals ; jurisdiction over the territory still remaining in the commonwealth.
The grant to the lessor of the plaintiff is dated the 28th of August 1851, and is for 264.72 acres, described as lying in Elizabeth City county, including the mud flats between low water mark on Mill creek, the Shelton patent and the tract of two hundred and fifty-two acres of land conveyed to the United States by the commonwealth of Virginia by deed, recorded in the elerk’s office of Elizabeth City county on the 12th day of December 1838, beginning at the east foot of Mill creek bridge, and thence along the United States land to the mouth of a small gut running into the marsh, the boundary of the United States land, and the Shelton patent.
The patent being long posterior in date to the act of cession and deed to the United States, and calling to be bounded by the lands of the United States, it becomes necessary to enquire into the extent of the grant to the United States. To ascertain this, it is important to determine whether the literal calls of the deed should alone be regarded as defining and designating the limits, by a fixed, unvarying, mathematical line, where nothing *151 else is called for, or whether it is competent to look at the law, and the plat and report of the surveyor, made out in pursuance of the instructions of the governor, to enable him to execute a conveyance, to ascertain what was the land actually intended to be ceded conveyed. ' There is no ambiguity apparent on the face of the deed. If any arises, it results from a comparison of the calls of the deed with the subject granted. By that comparison it appeared that the subject of the grant was a sandy peninsula, varying by the action and operation of the tides and winds. Most of the calls in the deed were for magnetic lines and distances not terminating upon any monuments or marked boundaries. A survey made out according to the mathematical lines and calls of the deed would, with the exception of three objects, the bridge and the two pines, represent no visible objects but the land and the water. The magnetic lines and courses would be found to pursue the general outline of high water mark; the high water line not being a right line from station to station, as it would follow the slight indentations in the shore, so that a right line from station to station would at some places cross the mouths of small inlets and vary above and below the precise high water line. If by such comparison of the calls with the subject granted a doubt should arise as to whether a fixed line or a water boundary was intended, a survey made by the direction of the grantor, and which was his guide in making the' conveyance, would be proper evidence to explain the ambiguity thus produced. Bowling v. Helm, 1 Bibb’s R. 88; Burton on Real Prop. 142.
In this case the deed of the governor refers to a plat and description made by C. Hubbard, acting surveyor of Elizabeth City county, dated the 17th of July 1838. The report of the surveyor in evidence in this cause bears date the 30th of July 1838. But it is obvious that the report was accompanied by a plat; for he *152 speaks of having made the surveys directed, and of havspread the low water line, and mud flats and grass on the plat. The survey necessarily preceded ^ rep0r¿} an¿ accordingly, the certificate on the plat from the executive department shows that the survey was made on the 17th of July 1838. But the plat gives no courses and distances; they are found in the report, from which they were copied into the deed. There is no doubt, therefore, that the report as well as the plat were before the governor when he executed the conveyance, and were intended to be referred to in the deed; and whether actually referred to or not, yet as they were made out by the officer selected by the governor to enable him to execute the grant, it would be evidence as against the grantor as to the subject intended to be granted.
But this was not a transaction between individuals, but between state and state; and is to be considered and construed with reference to the character of the parties, and the object each had in view.
The act of assembly contemplated a survey; for as the cession was not to exceed two hundred and fifty acres, a survey was essential to ascertain the quantity of land, and to define the line of demarcation between the land eeded and the adjacent land, to show to what extent the jurisdiction ceded to the United States would reach. The title of the United States depends on the act of cession, and all that was done by the proper officers to carry it into execution. Until the quantity and locality of the land was ascertained, the title was incomplete; and as congress can only exercise exclusive jurisdiction in such places within a state, when purchased by the consent of the legislature of the state, the deed of the governor would not of itself confer title and jurisdiction. The act, the survey made necessary by it, and the deed were all necessary to consummate the title; and all must be *153 regarded, though occurring at different times, as parts of one entire compact; resulting in the transfer of a portion of the soil and jurisdiction of the state to United States for specified purposes, and subject to certain reservations contained in the act of cession. If we look at the deed as applied to the subject of the grant, and explained by the plat and report, we see that the descriptive part commences at the water mark, on one side of the tract, calls for fourteen magnetic courses and measured distances to the mouth of an inlet running up into the grass marsh. A reference to the plat shows that the three next lines pursued the line between the high land and the marsh, the ground of which is stated- on the face of the plat to be below the water at high tide, although the grass is generally above; so that all the lines from the beginning along Mill creek and the marsh correspond in general with the high water mark. The line across the neck commences at the edge of the marsh and terminates within the sixty poles called for, on the bay shore at high water mark; and from thence the lines run round by magnetic courses and distances to the beginning. The tract of two hundred and fifty acres is described as adjacent to, and in part surrounding the tract of two acres heretofore granted by the commonwealth to the United States, and the boundaries comprehend and include the two hundred and fifty acres and the two acres in one tract of two hundred and fifty-two acres. The act of January 2d, 1798, ceded so much of the public lands at Old Point Comfort, not exceeding two acres, as should be sufficient to erect a light-house. The boundaries of these two acres do not appear; but from the position of the light-house, as indicated on the plat, it may be fairly presumed it was or was supposed to be in part a water boundary; and' therefore the two hundred and fifty acres are described as adjacent to and in part sur *154 rounds said tract of two acres, evidently referring to the exterior or land boundary so surrounded by the hundred and fifty acres, and' indicating that by the two tracts into one by a common boundary, there would be a continuous water boundary round the whole to the beginning.
The surveyor in his report furthermore certifies to the executive that the agent of the United States elected the high water mark for his boundary; but requested him to spread the low water line and the mud flats and grass marsh on Mill creek on the plat; which he accordingly did. The plat on its face indicates, by black and dotted lines, both the high and low water line; and the surveyor certifies that he began at the southeast foot of the bridge, and then pursued the ordinary high water mark on the Mill creek shore to the mouth of the small gut running up into the grass marsh; and from thence he pursued the line between the high land and marsh to Shelton’s land; from thence by a line of marked pines to Chesapeake bay shore at the ordinary high water mark; and then he pursued the high water mark along the bay shore to the beginning; including an area of two hundred and seventy-eight acres one rood and ten poles, including the two acres ceded for a light-house. He then laid off the two hundred and fifty-two acres for the United States, including the two acres : And the plat shows that this was ‘done by running a line across the neck from the grass marsh to the bay shore, cutting off 26.16 acres from the whole area of two hundred and seventy-eight acres one rood and ten poles between the line of the United States and the land of Shelton; but no other change was made in the plat in respect to the boundaries of the two hundred and fifty-two acres.
From these facts it appears that no monuments or marks were fixed to indicate the curves and indenta *155 tions of the creek or bay, and from the character of the land in question it would have been difficult if not impracticable to have fixed a boundary at high or water mark as at the time of the cession or survey, which would point out at all future times the gradual and imperceptible encroachment of the waters at one place, and the gradual accretion of the land at another. The surveyor did not attempt to fix the boundaries by such artificial monuments. The running by the magnetic course and measured distance was essential to compute the quantity of land within the area. But the lines on Mill creek and the bay were open lines; and left open because the natural boundaries of the creek and bay, the waters of which he represented on the plat at high and low water mark, obviated the necessity of any artificial marks.
In the case of Starr v. Child, 20 Wend. R. 149, the deed called for a line to the Genesee river, and thence northwardly along the shore of said river to Buffalo street. The court held that there was no necessity for looking to extrinsic circumstances, for that the deed on its face invested the grantee with a fee simple to the bank of the river. The judge, in giving the opinion, remarks, “ That the cases show, what it is difficult for the human mind to resist, that the parties never mean to leave a narrow strip between the land and the river, merely because some stake or tree, or even all the stakes or trees of the line, stand at a slight distance from the river. The expression of an intent to run the line along the stream, reaches a distinct natural monument which overcomes the others.” So in the case of McCullock’s lessee v. Aten, 2 Ohio R. 425, it is said, “ That the fact that the marked corner called for stands four rods from the water, does not ereate any ambiguity in the terms, down the creek with the several meanders thereof. They import the water’s edge at low water, which is a decided natural *156 boundary, and must control a call for corner trees on ^e bank.”
In the case under consideration, no embarrassment arjses from a conflict between artificial monuments and -fche ]jne 0f high water mark, for no such monuments are called for. In Bruce v. Taylor, 2 J. J. Marsh. R. 160, the grant called to begin on the Ohio river, thence by courses and distances, without any marked lines or comers, to the mouth of a creek emptying into the Ohio, thence by courses and distances, without any marked lines or comers, to a stake; and thence for courses and distances round to the beginning. The court held, that as three of the calls were on the river, as there were no intermediate marked lines and corners, and as the general description was “ to lie on the Ohio river,”—“ these facts alone would not leave room for any other legal construction of the patent, than that the Ohio river with its sinuosities is one of the lines of its boundaries.” In the same case they say that even if the lines and courses had been marked, and the patent had called for the river as a line of the boundary, this call would control the marked line: It being a universal rule that the actual boundary, whether natural or artificial, shall control repugnant, course and distance. In that case, the original survey was exhibited, and showed the river as a boundary : “ This, the- court said, was decisive. The survey was the foundation of the patent: It is of record, and in that respect equal in dignity to the patent. It does not contradict but only renders fixed and certain some of the calls of the patent; and that it may be used to aid in supplying omissions, or in correcting mistakes in the patent.”
All these remarks 'apply directly to the case under consideration. The lands at Old Point Comfort having been held as public lands, their position in relation to the surrounding waters was well understood by the - *157 grantor. The law ceded the right of property and title as well as the jurisdiction “ over the lands at Old Point Comfort.” It contemplated a survey, as was necessary to ascertain the quantity; and as a conveyance was to be made by the governor, such survey would be naturally returned to the executive department, as his guide in describing the subject to be conveyed. The deed conveys the land at Old Point Comfort; it calls to begin on the water at the southeast foot of Mill creek bridge, and then for certain magnetic courses and measured distances to the mouth of a gut running up into the marsh; in all, fourteen calls without any artificial marks or corners or monuments. And on the other side it commences on the bay shore at high water mark, and thence calls for courses and distances sixteen lines, to the beginning; without a mark or corner on any of the lines. And in addition to this, the report of the surveyor sets forth that the officer of the United States elected the high water as his boundary; that he pursued the ordinary high water mark on the Mill creek shore; that he commenced at the ordinary high water mark on the Chesapeake bay shore, and pursued the high water mark along the bay shore to the beginning; and the plat returned exhibits the line of high water as the boundary of the land surveyed. All the circumstances which led the court to hold in the case of Bruce v. Taylor, that the legal construction of the patent, that the Ohio river with its sinuosities was one of the lines of the boundary, stand out with prominence in this case. To the same effect is the case of Rix v. Johnson, 5 N. Hamp. R. 520; and Angel on Water Courses, § 29, 30, where the authorities are reviewed. See also Mayhew v. Norton, 17 Pick. R. 357.
I think, that having regard to the law, the report and survey and deed of the governor, the legal construction of the whole transaction was to make the *158 boundary of the land ceded to and conveyed to the United States a boundary by the line of ordinary high water mark, except on the line extending from the marg^n 0f yle grass ma,rsh across the neck to the bay g]10re &j¡ Mgh. water mark.
The attorney general, when consulted by the executive, advised that the officers of the United States should elect whether they would have the whole survey laid off above high water, or whether they would include within its boundaries the lands below high water mark, and on the return of the survey the conveyance should be made by metes and bounds; being of opinion that the grant to the United. States must be limited to the metes and bounds laid off, and that they could not take jurisdiction over the adjacent lands below high water mark, as pertinent to the plotted land. And the governor directed surveys to be made in accordance with this opinion. From whence it is inferred that by his deed the governor intended to convey, by a certain fixed, invariable line, which, though it coincided generally with the high water at the time it was surveyed, must at all times be run according to the magnetic courses and measured distances, without reference to its actual correspondence with the line of ordinary high water mark, or the gradual and imperceptible changes caused by the encroachments of the bay or the accretions to the soil. The attorney general was correct in saying that the grant to the United States must be limited by the metes and bounds laid off, if by laid off is meant the bounds called for. But he cannot be supposed to have meant that such bounds must be artificial, made by the hand of man. Artificial monuments are liable to destruction; and surveyors seldom agree as to a precise mathematical line. The variation of the magnetic needle, uneven surfaces, and other causes, render it difficult, if not impracticable, to arrive at perfect accuracy; and hence natural or arti *159 ficial boundaries always control the mere magnetic calls. We are not, therefore, to suppose that a great natural boundary, as a river, or the shore of the bay, could not be adopted in a grant by a state to the United States. Convenience would seem to point out the latter as the most proper boundaries between two governments, where jurisdiction as well as property is regulated by the limits between them. “In a case of doubt,” say the Supreme court in Handly’s lessee v. Anthony, 5 Wheat. R. 374, quoting Vattel, “every country lying upon a river is presumed to have no other limits but the river; because nothing is more natural than to take a river for a boundary, when a state is established on its borders; and where there is a doubt, that is always to be presumed which is most natural and proper.” When, therefore, the officers of the United States elected the ordinary high water mark as the boundary, and the surveyor adopted it, and the deed conveyed to it, the land passes to the boundary so called for and adopted.
The attorney general and the agent of the United States differed as to the effect of such conveyance: The latter supposing it would give title and jurisdiction down to low water; the former, that title 'and jurisdiction would be fixed by the magnetic calls for courses and measured distances, no matter how the water line varied. And the question now is, what was the legal effect of the act done ? And that is a matter for judicial decision. If it were a mere grant of property, the jurisdiction remaining in the state, the right of the grantee would extend to ordinary low water mark, under the express provisions of the act of assembly, 1 Eev. Code of 1819, ch. 87, p. 341; which declares that hereafter the limits or bounds of the several tracts of land lying on the Atlantic ocean, the Chesapeake bay and the rivers and creeks thereof, within this commonwealth, shall extend to ordinary low water mark; and the owners of said lands shall *160 have, possess and enjoy exclusive rights and privileges anc^ al°nS the shores thereof, down to ordinary low water mark. By the common law, the title of the pr0prje-¡¡0r extends, to the ordinary high water mark. The shore, or that space alternately covered and left dry by the rise and fall of the tide, being the space between high and low water marks, was in the king for the use of the public. The law of Virginia, so far at least as relates to the soil, has, as appears by the act referred to, been altered; and the limits or boundaries of the land extend over and include the shore, by operation of law. This was the law in force when the cession of the land at Old Point Comfort was made, and the law being general, and speaking at every instant of time, it operated upon the grant to the United States, and extended the bounds down to ordinary low water mark; thereby annexing the right to the soil between ordinary high and low water mark as incident or appurtenant to the adjacent land.
The provisions of the act of 1819 have been incorporated in the Code, ch. 62, §1,2; and constituted the law when the patent of the plaintiff’s lessor was issued. But it is insisted that as the act ceded jurisdiction as well as property and title, that sovereignty cannot be yielded or granted by implication; and therefore, whatever might be the rule in the case of a private individual, there could have been no intention on the part of the state to apply such a rule to a grant of this description.
The state, in granting, where nothing appears to the contrary, must be presumed to have granted with reference to the general law. If she had granted to an individual, the right of property would have extended to the low water mark. If the United States, with the consent of the legislature, had purchased from the individual, the whole proprietary right would have passed; and if jurisdiction had been yielded, it must have been coincident with the right of property. *161 The whole right of property was transferred by the act of cession and the conveyance under it; and the jurisdiction followed. If an island had been the ject of the cession, the grant of soil and property would as here, extend to low water mark, and j urisdiction would follow. This cession might be assimilated to a grant of an island; it was known to be a peninsula nearly surrounded with water. A line across the narrow neck and the surrounding waters, furnishing the best and most convenient boundary for property as well as jurisdiction; and there being nothing in the terms of the grant to limit the bounds as to property, all the incidents of such a property attach to it, including the’ right to the gradual accretions, which being imperceptible in their progress, may in the course of years increase the area beyond the quantity originally conveyed.
The legal effect of the deed, therefore, was to transfer to the United States the land to low water mark, with all the incidents of property so situated, and jurisdiction coincident with it, unless it should appear that in executing the transfer the governor has transcended the power conferred upon him by the law under which he was acting.
In giving an interpretation to such an act, the character of the parties to it, the purposes of the cession, and the situation and nature of the thing granted must all be looked to, and such construction given as will, if possible, carry out, and not defeat, the intention which led to the grant. The parties were two governments, both equally interested in the accomplishment of the object in view, the erection and maintenance of the proposed fortifications. The purpose of the parties in making and receiving the cession is set forth in the preamble of the act. It recites that it was shown to the general assembly that the government of the United States was solicitous that certain land at Old *162 Point Comfort and the shoal called the Rip Raps, should, with the right of property and entire jurisdicthereon, be vested in the United States for the pUrp0se 0f fortification and other objects of national defence. In proceeding to execute a grant having these objects in view, the grant must be interpreted as intending to pass with the subject all the means necessary to carry into effect the design of the parties to it, and to preserve and maintain the fortifications in a state of efficiency thereafter. The legislature must have contemplated such a cession as would give the government of the United States free access to and the command of either shore. To erect the fortifications, docks and wharves would be necessary; to render them efficient, a free communication between the two fortifications and unimpeded command of the shore and channel between the forts, was essential. To maintain discipline in a large garrison, and a proper police for the preservation of health and the safety of the public property, jurisdiction thereon in the words of the preamble, was required. All these objects would be defeated if the state had retained the right to the soil between high and low water mark, and to the alluvion that might be formed. She could not have intended to retain it for any purpose of her own. It was for her interest that the fortifications should be so erected as to accomplish the object intended, the protection of her own citizens from foreign invasion. Nor could she have contemplated a sale of it as private property, upon which houses might be erected masking the guns of the fort, and a conflict of jurisdiction brought about subversive of the police and discipline of the fort and garrison. Such a construction would defeat the declared purpose of the law. The nature of the property was well known to the state. It had been dedicated to the purposes of dethe and had con *163 tinued as public property up to the time of the cession; a sandy peninsula projecting into the bay and connected with the main land by a narrow the water furnishing a proper boundary and the most palpable and convenient line of demai-cation between the two jurisdictions. These considerations necessarily imply that it was the intention of Virginia to cede and of the United States to receive so much of the land at Old Point Comfort, including all the land on the point from shore to shore, as would be comprised in an area containing the prescribed quantity of two hundred and fifty acres. This implication is supported by the language of the act: The governor is authorized to make over, by proper conveyance to the United States, the right of property and title, as well as all the jurisdiction the commonwealth possesses over the lands and shoal at Old Point Comfort and the Rip Raps; provided the cession at Old Point Comfort shall not exceed two hundred and fifty acres: Thus implying that the lands at Old Point Comfort meant all the lands from the point upwards, so far as the government of the United States should require, so as not to include more than the prescribed quantity in the area cut off from the adjacent lands. The provisoes that the cession should not prevent, abolish or restrain the right and privilege of fishery hitherto enjoyed and used by the citizens of this commonwealth within the limits aforesaid, or in any manner to prevent the pilots from erecting such- marks and beacons as may be deemed necessary, show that it was not supposed any right in the soil in the part of the land -at Old Point Comfort cut off from the adjacent land would be retained by the commonwealth. But contemplating a grant of property and jurisdiction to the water boundary, the rights and privileges theretofore enjoyed and used were to be preserved unimpaired.
In giving a construction to the legal effect of the *164 conveyance, so as to carry both property and jurisdic^011 ordinary low water mark, the intention of each party, the state in making and the United States in accepting the cession, is promoted; whilst any other construction would defeat the object of the parties and render the grant illusory. The legal construction of the effect of the conveyance extending the bounds of the grant from the line of ordinary high to ordinary low water mark, conforms to the general law and carries into effect the intention of the parties to the cession. By these transactions the state has parted with property and jurisdiction subject to the reservations and provisoes contained in the act of cession, within the limits of the grant to the United States, on the Chesapeake bay, Hampton roads and Mill creek down to ordinary low water mark. As an incident to such grant, the alluvion formed by the imperceptible increase of the land belongs to the United States; and therefore, there remained nothing within the limits aforesaid which could be made the subject of grant by the commonwealth to another.
If, as it has been argued, the land was to be laid off all around its area by metes and bounds, by which was to be understood fixed, unvarying lines, ascertained by permanent monuments or mathematical calls, it would have been the same, whether the ordinary low water or the ordinary high water mark had been elected as the boundary by the agents of the United States. The lines corresponding with either at the time of election, would have been fixed and unvarying. It would have been difficult if not impracticable to have designated such a line by artificial monuments, if low water had been selected, as every tide would have submerged them; and mathematical lines, the most uncertain of boundaries, must have been relied on. The low water mark on a sandy peninsula like this, will necessarily vary through the operation *165 of the winds and tides. As accretions, imperceptible in their progress, were formed, state jurisdiction would attach, varying as the alluvion increased, disappearing as it diminished. Even if there was more doubt as to the legal construction of the deed, the inconvenience of the construction contended for would be a strong objection to adopting it. In the language of the Supreme court in Handlly's lessee v. Anthony, 5 Wheat. R. 374, “In questions which concern boundar' s of states, (and here jurisdiction is involved,) v ien great natural boundaries are established in g aeral terms, with a view to public convenience and the avoidance of controversy, the great object, where it can be distinctly perceived, ought not to be defeated by those technical perplexities which may sometimes influence contracts between individuals.”
Questions were raised at the trial, and have been argued here, as to the validity of the patent to the lessor of the plaintiff. It is insisted by the defendant that the lands at Old Point Comfort could not be entered, surveyed and patented as waste and unappropriated lands of the commonwealth ; that the acts of the government had separated these lands from the mass of wraste and unappropriated lands, and reserved them for the public use as a site for fortifications and defence; and that this is a matter which any defendant sued by another claiming under a patent under the general law, may set up to defeat this action.
It seems that as early as 1629-30, 6 Charles 1st, an act was passed by the assembly for the “ raysing of a ffort at Poynt Comfort;” and certain persons named “ by full consent of the whole assembly, were chosen to view the place,”—“and agree for the building, raysing and finishing of the same.” A fort seems to have been erected, and various regulations in regard to the fort are found in the 1st vol. of Hening’s Statutes, p. 166, 175, 215, 218. In 1639, an act was passed *166 levying taxes to pay the captain of the fort and ten guar<ls> and to build a new fort at Point Comfort. In 1671, Governor Sir William Berkeley, in reply to enqU}ries submitted by the lords commissioners of foreign plantations, reported that there were five forts in the colony, two in James river, but that they had neither skill or ability to make or maintain them, &c. 2 Hen. Stat. 512.
It does not appear from anything in the Statutes at Large whether a fort was continued at the point during the residue of our colonial history or not. By the revolution the commonwealth succeeded to the rights and dominion of the crown. In May 1779 the act passed for establishing a land office and ascertaining the terms and manner of granting waste and unappropriated lands; subjecting such lands to entry under land office treasury warrants, providing for the making and return of surveys, and for the issuing of patents. But in addition to the waste and unappropriated lands thus made the subject of entry, survey and grant in the mode prescribed, there were certain lands in the eastern part of the state which, by the acts of the agents of the crown or commonwealth, the proprietor of all the waste lands in the commonwealth, had been set apart and appropriated to public purposes. It does not appear that any specific grant or special act passed for such appropriation. They seem to have been dedicated to the public use, by being so used and enjoyed. When referred to in the laws, they are designated as public lands, and a specific mode of disposition was prescribed. Thus the act of May 1784, 2 Rev. Code of 1819, p. 414, directed that all public lands and other public property in or near the city of Richmond, except so much thereof as should be set apart by the executive for the use of the government, should be sold by certain commissioners named in the act. By another act, passed May 1784, 2 Rev. Code *167 415, all the public lands in this commonwealth, except those thereafter mentioned, were directed to be sold by commissioners named in the act. By the 3d sec tion, certain of those lands in and near Williamsburg and in James City were transferred to and vested in the president and professors of William and Mary university forever. By the 4th section, the commissioners were empowered to sell the lands commonly called Gosport, except such part as in their opinion may be necessary for the use of the public. In October 1784, 2 Rev. Code 419, another act passed in relation to the disposition of the public lands called and known by the name of Gosport, and authorizing the commissioners to convey to purchasers thereof an estate in fee simple. In October 1785, 2 Rev. Code 423, an act entitled “ an act for the sale of certain public lands,” was passed, by which it was enacted “ that the public lands in the counties of York and Elizabeth City, except a point of land in the last mentioned county, called Point Comfort, should be vested in certain commissioners by name, who were empowered to sell and convey the same to purchasers.”
All these acts were passed after the general land law of May 1779, throwing open the waste and unappropriated lands within the territory of this commonwealth to entry, survey and patent by all adventurers. Yet it is manifest that the legislature did not suppose that lands set apart for public purposes, or the public lands were embraced under the designation of waste and unappropriated lands. Special acts were passed for the sale of these public lands by commissioners, and the title of the state passed not by patent but by a conveyance of the commissioners specially authorized to execute deeds. The act last mentioned shows that the point of land in Elizabeth City county, called Point Comfort, was so held, not as waste and unappropriated land, liable to entry under a land warrant, )ut as public land, the title to which had vested in the *168 commonwealth for special purposes. By the act of January 2d, 1798, 1 Rev. Code 1819, p. 48, the go-was authorized by deed to convey to the United g£a£eg ap interest in and right and title to, as well as a]| the jurisdiction which the commonwealth possessed over, so much of the public lands not exceeding two acres, situate in Elizabeth City, at a place commonly called Point Comfort, as should be sufficient to erect a light-house. Here again the land is treated as public land belonging to the commonwealth, the title to which was to be transferred by deed. A proviso in this law continued to the citizens of the commonwealth the privilege they then enjoyed of hauling their seines on the shores of said land. And by the act of cession the commonwealth authorized the governor to transfer by deed her right and title as well as the jurisdiction she possessed over the lands and shoal at Old Point Comfort and the Rip Raps. As a general rule, all lands which had never before been patented are to be considered as waste and unappropriated, and are liable to location by any holder of a treasury warrant. But as the crown first and the commonwealth afterwards owned all the public domain, it was competent for either to set apart a portion thereof for specific purposes. The early proceedings of the colonial legislature show that this point of land was so set apart; and from the fact that no attempt appears to have been made to take it up as waste land until recently, it would seem that the public right was universally acknowledged. The laws passed since the act of May 1779, recognize the existence of such public lands, provide for a specific mode of disposition, treat this as a portion of such public lands, and reserve it from sale, and the acts of 1798 and 1821 treat it as the public property of the state, when about to cede portions of it to the United States.
These various acts amount to a complete appropriation to the public use of the lands at Old Point Com *169 fort, held by the commonwealth, and excepted from the sale of other public lands by the act of 1785, and withdrew them from the mass of waste and priated lands. They were not liable to entry, survey and patent as such; and the patent therefore passed no title whatever. The act of March 31st, 1851, Sess. Acts, p. 33, protecting the magazine at Westham and any stone quarry now worked by the state from grant, cannot be so construed as to subject all other lands owned by the state, and held for specific purposes, to location as waste and unappropriated: It may confer the immunity of public lands upon the property therein mentioned if it was waste and unappropriated before that act. On this ground the plaintiff showed no title; and it was competent for any person to rely upon this defence. It is not like the case of a contest between claimants to a portion of the waste and unappropriated land under conflicting claims. In such controversies, private rights alone come under review; and we give no opinion as to the right of a defendant in ejectment to object to the validity of the plaintiff’s patent in such a case. But where the right is vested in the commonwealth for the benefit of the public, as in the case of the public square in the city of Bichrnond, the navigable waters and the soil under them held by the commonwealth for the common use, and expressly exempted from grant by the Code, ch. 62, § 1, it would be unreasonable and oppressive if the individual could not protect himself from an action of trespass brought by the patentee, until the patent had been repealed or shown to be invalid in some proceeding having that object directly in view.
These observations upon the rights of the parties dispose of all the questions raised by the instructions moved for on either side, and given or refused at the trial.
The first instruction asked for and refused, asserts- *170 the proposition that the deed alone can be regarded to ascertain the rights' of the United States. It has been shown that the title of the United States jepenc¡s Up0I1 the law, the proceedings had in execution of it, and the deed. They were all necessary to complete the cession, and must be looked to in order to find out what was intended to be granted and was in fact granted to the United States: The instruction was therefore properly refused.
The second instruction is rather an abstraction than an instruction bearing on the case, and for this reason properly refused as calculated to mislead the jury. The terms are obscure, but the first clause would seem to imply that where a latent ambiguity arises from a comparison of the calls of the deed with the subject of the grant, no evidence aliunde could be received to explain it. It is in such cases that evidence aliunde must be resorted to; and as has been already remarked, the law, the survey, report and deed must all be regarded in arriving at the intention of the parties, and to ascertain the extent of the cession. That instruction was properly refused.
The third instruction is based upon a state of facts not existing. Courses and distances are not alone called for in the deed. The southeast foot of Mill creek bridge, the mouth of the small gut running into the marsh, the dead pine, the line between the high land and the marsh, the pine, the bay shore at high water mark, are all called for; for this reason the instruction was properly refused, as calculated to mislead, and also because it asks for a legal construction of the effect of the deed, which the law did not warrant.
Nor did the court err in any of the instructions given to the jury at the instance of the defendant. From what has been already said, it appears that the deed, construed with reference to the law and acts *171 done in execution of it, gave to the United States a boundary, by operation of law, to the ordinary low water mark; and consequently the lessor of the tiff could acquire no title by his patent to any lands described in the deed, which lie above ordinary low water mark.
The third instruction, in regard to the lands covered by the waters of Mill creek at ordinary high tide, is to be taken secundum subjectam materiam. So far as it comes in collision with the defendant’s grant, the patent could give no title, and as the grant to the defendant, by extending to ordinary low water on Mill creek embraced all that could be the subject of grant, the patent to the plaintiff’s lessor could give no title to such lands.
The fourth instruction is similar, in the principle involved, to the third.
The fifth is equally free from objection, taking it secundum subjectam materiam, which was the lands in controversy as claimed by the defendant. These lands had been granted, and property and jurisdiction parted with. They were, therefore, no longer waste and unappropriated at the date of the entry on which the patent issued to plaintiff’s lessor; and upon the further ground, which was probably the meaning of the court, that the lands at Old Point Comfort, extending to low water mark on the Chesapeake bay, Hampton roads and Mill creek, were public lands, and not liable to appropriation by entry, survey and grant, as part of the waste and unappropriated lands of the commonwealth.
We think there is no error in the judgment, and that it should be affirmed.
Judgment affirmed.